IN THE UNTED STATES DISTRICT COURT
FOR THE SOURTHERN DISTRICT OF NEW YORK

| ANN MOLINA, | | CIVIL ACTION |
|---|---|---|
| | Plaintiff, | No. 13CV3018 |
| -against- | | |
| COUNTY OF ORANGE | | Assigned to:<br>Hon. Edgardo Ramos |
| | Defendant. | |

## **SPECIAL MASTER'S REPORT AND RECOMMENDATIONS**

## TABLE OF CONTENTS

I.   Introduction ............................................................................................................. 1

   A.   Background ...................................................................................................... 1

   B.   Development of the Redistricting Plans .......................................................... 3

   C.   Procedural History .......................................................................................... 6

   D.   Personnel Assisting the Special Master ......................................................... 7

II.  One-Person, One-Vote Claim ................................................................................. 8

III. Voting Rights Act Section 2 claim ....................................................................... 10

IV.  General Principles Guiding Drawing of the Special Master's Plan ...................... 13

V.   Recommendations For New Legislative Districts ................................................. 15

VI.  Conclusion ............................................................................................................. 32

NY 243049980v6

## INDEX TO APPENDICES

TAB 1        Existing Legislative Districts as drawn in 2005

TAB 2        Table Showing 2010 population and deviation from 2005 Map

TAB 3        Preliminary Map (Map 1)

TAB 3A       Data for Map 1

TAB 4        Revised Map. (Map 2)

TAB 4A       Data for Map 2

TAB 5        Revised Map (Map 3) presented at public hearing

TAB 5A       Data for Map 3

TAB 6        Minutes of February 26, 2013 Rules Committee Meeting

TAB 7        Minutes of March 11, 2013 Public Hearing

TAB 8        Minutes of March 12, 2013 Special Meeting of Rules Committee

TAB 9        Revised Map (Map 4)

TAB 9A       Data for Map 4

TAB 10       Minutes of March 21, 2013 Special Meeting of Rules Committee

TAB 11       April 5, 2013 Legislative Session and Proposed Local Law 10 of 2013

TAB 12       Revised Map (Map 5)

TAB 12A      Data for Map 5

TAB 13       Minutes of April 23, 2013 Rules Committee Meeting

TAB 14       Resumes of Orange County Department of Planning personnel

TAB 15       Resume of Henry M. Greenberg, Shareholder, Greenberg Traurig LLP

TAB 16       Population of Orange County, City of Newburgh and City of Middletown by Race

TAB 17       Election Districts and Population by Municipality

TAB 18       NEW MAP of Proposed Legislative Districts

TAB 18A      Population and Demographic Data for Proposed 2013 Legislative Districts

NY 243049980v6

## I.    **INTRODUCTION**

On May 14, 2013, Judge Edgardo Ramos of the United States District Court for the Southern District of New York issued an order appointing a Special Master in this action pursuant to Federal Rules of Civil Procedure 65 and 53(a)(1)(A) and the "Court's inherent equitable power". The order directed the Special Master to "propose a new set of legislative districts that are in compliance with the principles of one person/one vote and the Voting Rights Act of 1965" and to make "every effort to provide the Court with a proposed map by or before June 3, 2013." This Report with recommendations is submitted in compliance with the direction of the Court.

### A.    **Background**

After the 2010 Census, and upon its publication, the County of Orange ("the County"), consistent with its County Charter, (Article II, Sec. 2.08) was required to begin the process of redistricting its legislative districts to comply with the federal requirements of one person/one vote and the Voting Rights Act of 1965 as amended. The existing legislative districts were created in 2005 after the 2000 census data became available and general elections based upon these legislative districts were held in 2005 and 2009. With a general election for County legislators scheduled to be held this November and -- given the County Legislature's failure to adopt new and legal legislative district lines for the conduct of such election -- Plaintiff Ann Molina ("Plaintiff") by the instant action, seeks declaratory and injunctive relief against the County.

Plaintiff alleges that the census data demonstrate that many of the districts – 21 in number – drawn in 2005 substantially deviate from the median population of 17, 753 for each of the twenty one districts, as derived from the 2010 census results which reflected a total county

1

population of 372,813. This number has been since adjusted to 371,284 with 17,680 people being the so called "target population" for each legislative district as a result of using data supplied by the New York State Legislative Task Force on Demographic Research and Reapportionment (LATFOR data) which removes state and federal prisoners from the location of their prisons and re-assigns such prisoners for redistricting purposes to the location of their last known residence of record. Implementing the desire of the County to use this data, the report will use the 17,680 number as the preferred adjusted median population number for each new district to be created.

Using 17,680 as a mean and defining "substantial deviation" as being plus or minus 5% -- it is obvious that there exists a substantial deviation in several districts. See attached map showing existing districts as drawn in 2005 (TAB 1) and the current approximate population as set forth in 2010 census data and the resultant deviations (Tab 2). The data show, for example, that existing district 1 has a current approximate population of 22,945, which would be 29.78% above the targeted mean of 17,680. Similarly, district 4 with a population of 15,135 is under populated and results in a minus 14.39% deviation. Plaintiff herein is a voter who resides in current legislative district 14 with a population of 21,629 which deviates by 22.34% from the targeted median population for each district. Plaintiff alleges that her vote, as well as the vote of the other residents of that district is "minimized and diluted" when compared with residents of district 13, for example, which has a total population of 15,675 deviating more than minus 11% from the targeted mean of 17,680. There are many other deviations noted which cry out for the drawing of new lines.

B.    **Development of the Redistricting Plans**

The process of re-districting for the 2013 legislative election, unfortunately, began much too late.  It wasn't until the latter part of 2012, that the County of Orange Planning Department (the "Planning Department") was instructed by the Chair of the Legislature to enumerate the population of the County and prepare preliminary redistricting maps for the legislative committee (the "Committee") handling the redistricting process.  It should be noted that this Committee consisted of the Chair of the Legislature and one other member.  Never was a Commission composed of County residents formed as provided for by the Orange County Charter and the Orange County Administrative Code §2.19 to review the census data and come up with proposed new district lines[1].

In preparing the maps for the Committee, the Planning Department further determined that the districts needed to be contiguous, should be as compact in land area as possible, and should endeavor to keep "communities of interest together".  Generally, "community of interest" is defined as a municipality -- a city, town or village, a hamlet, or other defined community. Since the towns in Orange County contain very large land areas, the Planning Department chose to honor cities, villages and hamlets as communities of interest, and attempted as much as possible to minimize the number of districts per town.  The Planning Department was further instructed by the Committee that each legislative district should be comprised of election districts of which there are 318 (as opposed to census blocks of which there are 10,034) and to

---

[1] The Orange County Charter provision which calls for the reapportioning of the County Legislature is Section 2.08 which cross references the Orange County Administration Code. Section 2.19 of the Code as it relates to reapportionment states in part as follows:  "Each such plan [of reapportionment] shall be based upon the distribution of population throughout the County.  It shall conform to applicable guidelines and rules relating to apportionment and provide for districts as nearly compatible with local governmental lines within the County as shall then be practicable.  To assist it in the preparation of each such plan, the Board [of Elections of the County of Orange] may appoint a commission composed of County residents and such of its members as it may deem appropriate."

3

preserve incumbency by placing the residency of each incumbent legislator in his or her election district.

A preliminary map (Map 1) (TAB 3) had been prepared which included the 21 legislative districts, each with a population as close to the target population of 17,680 people as possible and adhering to the guidelines enumerated above. Working from the map, several iterations of "The Map" were produced by the Planning Department reflecting the suggestions made by the Committee, (Map 2), (TAB 4) and reflecting revisions to the County election districts in the City of Newburgh and Town of Monroe, (Map 3) (TAB 5). The Legislative Rules, Enactments and Intergovernmental Relations Committee (the Rules Committee) met on February 26, 2013. Among the agenda items was the reapportionment item and it was decided that Map 3 would be presented at a public hearing to be held on March 11, 2013 (see minutes of Rules Committee meeting). (TAB 6)

Testimony presented at the public hearing alerted the Planning Department that it was possible to create minority districts in the City of Newburgh and Middletown[2] and doing so would be in keeping with the spirit of the Voting Rights Act. See minutes of Public Hearing. (TAB 7)

---

[2] Data submitted by Planning Department. *Demographic changes in Orange County, 2000-2010.* As of 2010, the population of Orange County that identifies as Hispanic or Latino was 67,185 people, approximately 18% of the County's population, compared to 11.6% or 39,738 people in 2000. While some of this increase in population can be attributed to natural increase (more births than deaths in a given population and timeframe), the majority of this increase is due to in-migration from other counties in New York State, primarily the five boroughs of New York City, and other states in the United States. In that same time period, the African-American population of Orange County has gone from approximately 8.1% or 27,601 people in 2000 to approximately 10.2% or 37,946 people in 2010. Both these demographic groups live throughout the County, but are largely concentrated in the cities of Newburgh and Middletown. The African-American population of the city of Newburgh in 2000 was 9,314 people comprising 32.9% of the city's population; in 2010 that group had declined to 8,706 people and 30.2% of the population). The Hispanic or Latino population in the city of Newburgh in 2000 was 10,257 people or 36.3% of the city's population, increasing to 13,814 people or 47.9% of the population in 2010. The African-American population in the City of Middletown in 2000 was 3,840 people or 15.1% of the city's population; in 2010 that group had increased to 5,902 people and 21.0% of the population. The Hispanic or Latino population in the City of Middletown in 2000 was 6,375 people or 25.1% of the city's population; in 2010 that demographic group had increased substantially, with a population of 11,158 people comprising 39.7% of the city's population.

4

This was followed by a Special Meeting of the Rules Committee the following day, March 12, 2013 wherein the comments expressed at the Public Hearing were discussed and it became obvious that further revisions to the map and proposed local law were necessary. See minutes of Special Meeting. (TAB 8) Using the map and data presented at the public hearing by the State University of New York at New Paltz, Center for Regional Research, Education and Outreach, (CRREO) the Planning Department prepared a "MAP 4", creating a Latino minority district in the City of Newburgh and a Latino plurality district in the City of Middletown. See Map 4. (TAB 9)

A second Special Meeting of the Rules Committee was convened on March 21, 2013 to review the revised Legislative District Map (Map 4). The Planning Department participated in the meeting as it had on all prior occasions explaining the changes and the rationales for each change. See minutes of March 21, 2013 Rules Committee Meeting. (TAB 10) This current map, Map 4, and the related Local Law was finally presented to the full Legislature at a legislative session on April 5, 2013 for their approval or rejection. Twenty out of twenty-one legislators were present that day and the vote was 10 in favor of the plan and 10 against which resulted in a rejection of the map and the proposed Local Law No. 10 of 2013. (TAB 11)

Later, that very day, a delegation of two legislators visited the Planning Department, requesting further changes to the proposed map, indicating that further revisions might result in legislative approval. Accordingly, the Planning Department prepared a Map 5 which purports to address some of the concerns voiced at the regular session of the Legislature held on April 5, 2013. (TAB 12) This map was posted on the County Legislature's website and made available for review at the Rules Committee Meeting of April 23, 2013. The Rules Committee declined to present Map 5 for discussion. See minutes of April 23, 2013 meeting. (TAB 13)  It was

5

believed that there was insufficient time to complete the process this year and that re-districting should await another year.  Some expressed a preference to leave the drawing of a proper map to the courts.  Consequently, it was resolved that the 2013 County legislative elections would be based on the existing 2005 district lines, which as alleged in Plaintiff's complaint substantially deviate from the median population and violate the Federal Constitution and the Voting Rights Law.

### C.    Procedural History

Plaintiff, commenced this action in United States District Court for the Southern District of New York, and, by way of Order to Show Cause sought a temporary restraining order and a preliminary injunction enjoining the County from proceeding with its 2013 election for the County Legislature pursuant to legislative districts established in 2005.

The parties reached agreement on certain matters, and on May 14, 2013 District Court ordered as follows:

"IT IS HEREBY ORDERED:

1.  The 2013 elections for the Orange County Legislature shall not be held based upon the legislative districts established in 2005, in reliance upon the 2000 censes.

2.  The schedule previously established by which candidates for the County Legislature circulate designating petitions, challenge other candidates' petitions and allow administrative and judicial resolution of any such challenges cannot be practically adhered to and is hereby preliminarily enjoined.  The Board of Elections of the County of Orange is so enjoined, solely to the extent set forth herein, and may otherwise discharge its duties with respect to all elections which are not dependent upon the redistricting demanded in the Complaint filed in this matter.

NY 243049980v6

3. Because the election of County Committee members for both the Republican and Conservative Parties relies upon the 2000 census, and the parties have stipulated as such, petitioning for said positions is also enjoined pending the development and approval of a constitutionally compliant redistricting map for the Orange County Legislature."

It was also agreed that a Special Master would be appointed and pursuant to the District Court's May 14, 2013 order, Carmen Beauchamp Ciparick was appointed to serve as Special Master with all the authority and powers as set forth in Fed. R. Civ. P. §53.

**D.     Personnel Assisting the Special Master**

To assist the Special Master the order directs that "the County of Orange Planning Department shall assist the Special Master as per request and is authorized to develop one or more maps consistent with the law and present the same to the Special Master."  The Special Master has worked closely with the Planning Department and appreciates the technical assistance rendered by Commissioner David Church and the most talented and cooperative planners, Megan Tennerman and Matthew Ryan.  See attached resumes (TAB 14).  The Special Master was further empowered "to employ persons including staff at Greenberg Traurig LLP, to assist in the redistricting process."  The Special Master, herself, is of Counsel to the firm of Greenberg Traurig and has employed the assistance of Henry M. Greenberg, Esq. a shareholder of the firm from its Albany office.  See attached resume. (TAB 15)

A meeting in aid of performance of the assigned task was held on Thursday, May 23, 2013 attended by the Special Master and Mr. Greenberg, the lawyers for the parties, Michael Sussman and Benjamin Ostrer, the Planning Commissioner, and the two planners and David Darwin, County Attorney.  The meeting was most productive and yielded what the Special

Master believes to be a fair resolution of this controversy and a constitutional re-drawing of the Legislative District lines.

## II.     ONE-PERSON, ONE-VOTE CLAIM

The "one person, one vote" principle is grounded in the Equal Protection Clause of the Fourteenth Amendment. *Reynolds v. Sims,* 377 U.S. 533 (1964). It prohibits the dilution of individual voting power by means of districting plans that allocate legislative seats to districts of unequal populations and thereby diminish the relative voting strength of each voter in overpopulated districts. In *Reynolds,* the Court held that "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." The Court required states to "make an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." *Id.* at 577.

While the Supreme Court has held that absolute population equality is required for congressional districts, *Karcher v. Daggett,* 462 U.S. 725, 732-33 (1983), districting plans for state legislative seats require only "substantial" population equality. *See Gaffney v. Cummings,* 412 U.S. 735, 748, 93 S.Ct. 2321, 37 L. Ed. 2d 298 (1973). The Court has recognized that minor deviations from absolute population equality may be necessary to permit states to pursue other legitimate and rational state policies. *See Reynolds,* 377 U.S. at 577-81, 84 S.Ct. 1362; *see also Mahan v. Howell,* 410 U.S. 315, 321-22 (1973). Particular state policies that justify minor deviations from absolute population equality generally include "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." *Karcher,* 462 U.S. at 740.

Because the promotion of these important state policies will often necessitate "minor deviations" from absolute population equality, the Court has held that such minor deviations,

8

alone, are insufficient to establish a prima facie case of invidious discrimination. *Voinovich v. Quilter,* 507 U.S. 146, 160-62 (1993). In *Brown v. Thomson,* 462 U.S. 835, 842 (1983), the Court held that redistricting plans with a maximum population deviation below ten percent fall within the category of minor deviations that are insufficient to establish a prima facie violation of the Equal Protection Clause. "Thus, a redistricting plan with a maximum deviation below ten percent is prima facie constitutional and there is no burden on the State to justify that deviation." *Marylanders for Fair Representation, Inc. v. Schaefer,* 849 F. Supp. 1022, 1031 (D.Md.1994) (three-judge court); *see Holloway v. Hechler,* 817 F. Supp. 617, 623 (S.D.W.Va.1992) (three-judge court), *aff'd mem.,* 507 U.S. 956 (1993); *Fund for Accurate & Informed Representation, Inc. v. Weprin,* 796 F. Supp. 662, 668 (N.D.N.Y.) (three-judge court), *aff'd mem.,* 506 U.S. 1017, (1992); *Gorin v. Karpan,* 788 F. Supp. 1199, 1201 (D.Wyo.1992) (three-judge court); *Cosner v. Dalton,* 522 F. Supp. 350, 357 n. 11 (E.D.Va.1981) (three-judge court).

Compliance with *Brown* 's "ten percent rule" does not end the inquiry. There is still a question of how the "ten percent rule" dovetails with *Reynolds* and its progeny, which require a "good faith effort" by the state to achieve "as nearly of equal population as is practicable." *Reynolds,* 377 U.S. at 577. For example, a three-judge court in *Hastert v. State Board of Elections,* 777 F. Supp. 634, 645 (N.D.Ill.1991), suggested that "minute population deviations remain legally significant." The court in *Corbett v. Sullivan,* 202 F. Supp.2d 972, 987 n. 7 (E.D.Mo.2002) (citing *Karcher,* 462 U.S. at 738-40, held that "[e]ven deviations smaller than the census margin of error must be the result of a good faith effort to achieve population equality."

Such "good faith effort to achieve population equality" has been employed in the redrawing of the legislative district lines here. The Special Master in consultation with counsel for both parties and with the assistance of the Department of Planning developed a proposed

9

map, using neutral principles, which cures the constitutional infirmities that exist in the 2005 map. All legislative district lines have been redrawn to achieve as close to the target population of 17,680 people per district as possible, with a deviation of less than 5% for each district, while making districts compact and contiguous, respecting municipal boundaries and communities of interest and of great importance in the City of Newburgh and Middletown respecting the rights of minority voters.

A similar legislative re-districting occurred in Erie County not long ago. There Chief Judge William M. Skretny in *Mohr* v. *Erie County Legislature*, 11-CV-559S, 2011 WL3421326 (W.D.N.Y. Aug. 4, 2011) adopted a plan for reapportionment of the Erie County Legislature based on 2010 census figures for the 2011 election. Similar to the instant case, the County legislature was unable to draw constitutional lines conforming with the equal protection clause and the principles of one-person one-vote. There existed a question of minority voting strength which the District Court resolved by creating two majority-minority districts in the City of Buffalo. The Court respected municipal boundaries, where possible, did not favor one political party over the other and created a plan that in its opinion "best serves the voters of Erie County" and is a "plan that will govern through the remainder of this decade – i.e., until 2020 census data becomes available."

## III.   VOTING RIGHTS ACT SECTION 2 CLAIM

Plaintiff also alleges that Orange County's districting plan for its County Legislature -- the 2005 plan -- violates the rights of minority voters under Section 2 of the Voting Rights Act ("VRA"), 42 U.S.C. § 1973. That statute provides as follows:

> (a)     No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

(b)    A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(a)-(b) (emphasis in original).

In *Thornburg v. Gingles,* 478 U.S. 30 (1986), the Supreme Court recognized that a redistricting scheme may violate Section 2 by diluting the minority vote.  *Gingles* sets forth the following three "necessary preconditions" to establish a viable Section 2 claim of vote dilution: (1) the relevant minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district";[3] (2) the relevant minority is "politically cohesive" in terms of voting patterns; and (3) the majority "votes sufficiently in a bloc to enable it . . . in the absence of special circumstances . . . usually to defeat the minority's preferred candidate."  *Id.* at 50-51. No specific showing of discriminatory intent is required to sustain a § 2 vote dilution claim. *United States v. Village of Port Chester,* 704 F. Supp. 2d 411, 418 (S.D.N.Y. 2010) (citations omitted).

It is the plaintiff's burden to demonstrate the existence of vote dilution.  *Voinovich v. Quilter,* 507 U.S. 146, 155–56 (1993).  Accordingly, each of the three preconditions must be

---

[3] "The Court of Appeals for the Second Circuit . . . has permitted blacks and Hispanics to be combined for the purposes of complying with the first *Gingles* precondition, provided the groups are shown to be politically cohesive."  *Rodriguez v. Pataki,* 308 F. Supp. 346 (S.D.N.Y. 2004)  (citing *Bridgeport Coalition for Fair Representation v. City of Bridgeport,* 26 F.3d 271, 276 (2d Cir.), *vacated and remanded on other grounds,* 512 U.S. 1283 (1994)); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 281 F.Supp.2d 436, 445 (N.D.N.Y.2003) (citing *Bridgeport* in stating that Second Circuit law "assumes diverse minority groups can be combined to meet VRA litigation requirements" crafted by *Gingles*).

11

proven by a preponderance of the evidence.  *Gingles*, 478 U.S. at 50.  "[T]he *Gingles* requirements 'cannot be applied mechanically and without regard to the nature of the claim.'" *Bartlett*, 556 U.S. at 19 (quoting *Voinovich*, 507 U.S. at 158).  Vote dilution claims are "peculiarly dependent upon the facts of each case," requiring "an intensely local appraisal of the design and impact of the contested electoral mechanisms." *Gingles*, 478 U.S. at 79.

An analysis of the three *Gingles* preconditions and whether each has been proven by a preponderance of the evidence is the first step in a two-part analysis of a vote dilution claim on behalf of minority voters.  "The Supreme Court has found, however, that the satisfactory establishment of the three *Gingles* preconditions alone is not sufficient for a § 2 vote dilution claim to succeed." *Village of Port Chester*, 704 F.Supp.2d at 418 (citing *Johnson v. DeGrandy*, 512 U.S. 997, 1011 (1994)).  If the plaintiff can meet the requisite threshold, the court must then evaluate the "totality of circumstances" to determine whether the minority groups have been denied an equal opportunity to participate in the political process and elect candidates of their choice.  42 U.S.C. § 1973(b); *Gingles*, 478 U.S. at 44–45; *see also Bartlett v. Strickland*, 556 U.S. 1, 11–12 (2009) ("In a § 2 case, only when a party has established the *Gingles* requirements does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances."); *Goosby v. Bd. of the Town of Hempstead*, 956 F.Supp. 326, 329 (E.D.N.Y.1997) (Court must "consider whether, under the totality of the circumstances, the challenged practice impairs the ability of the minority voters to participate equally in the political process").

"[Section] 2 can require the creation of "majority-minority districts [in which] a minority group composes a numerical, working majority of the voting-age population." *Bartlett*, 556 U.S. at 13 (citing *Voinovich*, 507 U.S. at 154 ("Placing black voters in a district in which they

constitute a sizeable and therefore 'safe' majority ensures that they are able to elect their candidate of choice."). "Majority-minority districts are . . . required if all three *Gingles* factors are met and if § 2 applies based on a totality of the circumstances." *Id.* at 24.

However, "[n]othing in § 2 grants special protection to a minority group's right to form political coalitions. '[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground.'" *Id.* at 15 (second alteration in original) (quoting *Johnson v. De Grandy,* 512 U.S. 997, 1020 (1994)). "Section 2 [also] does not impose on those who draw election districts a duty to give minority voters the most potential, or the best potential, to elect a candidate . . . ." *Id.* (emphases added). It "does not guarantee minority voters an electoral advantage." *Id.* at 20. The Supreme "Court [has] rejected the proposition . . . that § 2 entitles minority groups to the maximum possible voting strength." *Id.* at 15–16 (emphasis added); *see also id.* at 23 ("When we address the mandate of § 2, . . . we must note it is not concerned with maximizing minority voting strength, *De Grandy,* 512 U.S., at 1022; and, as a statutory matter, § 2 does not mandate creating or preserving crossover districts.").

The Special Master's plan and re-drawing of Legislative District lines addresses the racial discrimination issues raised by plaintiff that exist in the City of Newburgh and Middletown and attempts to alleviate the Voting Rights Act violation by creating majority-minority districts in both Newburgh and Middletown. See chart showing population by race in both cities and the County as a whole. (See TAB 16).

## IV.   GENERAL PRINCIPLES GUIDING DRAWING OF THE SPECIAL MASTER'S PLAN

A federal court faced with the "'unwelcome obligation'" of drafting a remedial reapportionment plan, *Wise v. Lipscomb,* 437 U.S . 535, 540 (1978) (quoting *Connor v. Finch,*

431 U.S. 407, 415 (1977)), is required to act "circumspectly, and in a manner 'free from any taint of arbitrariness or discrimination,'" *Connor v. Finch,* 431 U.S. 407, 415 (1977) (quoting *Roman v. Sincock,* 377 U.S. 695, 710 (1964)).   To ensure that a court-drafted remedial plan appropriately reflects this role, federal courts have followed five general principles in drafting reapportionment plans.

First, a court-drawn plan should be limited to those changes necessary to cure any constitutional or statutory defect.

Second, "[a] court-ordered plan should 'ordinarily achieve the goal of population equality with little more than de minimis variation.'"   *Abrams v. Johnson,* 521 U.S. 74, 98 (1997) (quoting *Chapman v. Meier,* 420 U.S. 1, 26-27 (1975)). Of course, given that the core constitutional violation in this action was the failure to comply with the "one person, one vote" requirement, this principle is particularly important.

Third, the federal court should "defer to legislative judgments on reapportionment as much as possible," but only to the extent that such legislative judgments are unrelated to the constitutional violation the Court found.   *Upham,* 456 U.S. at 39, 42-43; *see also Abrams,* 521 U.S. at 85 ("*Upham* called on courts to correct-not follow-constitutional defects in districting plans.").

Fourth, a court-drawn plan should strive to ensure compliance with the Voting Rights Act.

Finally, once the constitutional and statutory requirements are met, the federal court should consider traditional state redistricting principles, "yet a court is forbidden to take into account any purely political considerations that might be appropriate for legislative bodies." *Wyche v. Madison Parish Police Jury,* 635 F.2d 1151, 1160 (5th Cir. 1981). *See also Favors* v.

14

*Cuomo*, Docket No. 11-cv-5632, 2012 WL 928216 (E.D.N.Y. 2012) (Magistrate Judge Roanne L. Mann when creating a plan redrawing New York State's Congressional districts, refused to consider incumbency concluding that "it may place the Court in the tenuous position of appearing to serve partisan political interests");  Robert P. Patterson, Jr., Master's Report in *Flateau* v. *Anderson*, 82 Civ.0876 (S.D.N.Y. 1982).

## V.   RECOMMENDATIONS FOR NEW LEGISLATIVE DISTRICTS

The Special Master in the instant action has striven to use neutral principles, has avoided purely political considerations and thus has not looked to preserve incumbency or any particular political party dominance.  The Special Master has, however, preserved local election districts so as not to disrupt local voting practices.  (*See* TAB 17.)[4]  The Special Master has adhered to basic re-districting principles such as population equality, compactness and contiguity and the preservation of communities of interest.[5]  The Special Master is pleased that the parties are in

---

[4] In Orange County, the legislative districts have traditionally been built from election districts, which boundaries are set by the Board of Elections.  Although there have been many changes to the County election districts between 2005 and the present, the most significant of those changes are the redrafting and renumbering of districts in the Town of Monroe and the City of Newburgh.  In 2011, the City of Newburgh approved a change to their charter that reconfigured the political division of the city from nine wards to four; thus the 23 election districts that existed prior to the change were reconfigured to 15 election districts with new boundaries and numbers.  In 2012, the Town of Monroe underwent election district changes due to the number of registered voters per district. Four existing election districts were split to accommodate new voters, bringing the total number of election districts in the Town of Monroe to 35; the Town of Monroe election districts were then renumbered so that the numbers would be more consecutive and logical.

[5] For redistricting purposes the communities of interest should include the cities and incorporated villages (except the Cities of Middletown and Newburgh and the Villages of Kiryas Joel and Woodbury, which are all too large in population to be included in a single district) and identified hamlets, but do not include towns. Many towns in Orange County have too much land area and population to be included in one legislative district.  Where possible, the number of districts in each town, have been minimized, and towns have been divided along natural or logical lines (for instance, taking into account school district and postal district boundaries). The Villages of Chester, Florida, Harriman and Maybrook all contain land area in more than one town; the Village of Harriman is the only one of these villages with significant population in more than one town.  Although it is possible to keep the Village of Harriman in one proposed Legislative District, the Villages of Chester, Florida and Maybrook are all split along the Town boundaries.

15

agreement with her proposed re-districting plan and respectfully makes the following recommendations to the Court.

The Special Master's recommendations herein were made after extensive consultation and technical assistance from the Planning Department.  What follows is an analysis of each legislative district as it is currently constituted and the Special Master's recommended legislative districts.  (*See* NEW MAP Prepared Legislative Districts (TAB 18) and Population and Demographic Data for Proposed 2013 Legislative Districts (TAB 18A)

**Legislative District 1**

The 2005 Legislative District 1 encompassed the entire Village of Kiryas Joel within the Town of Monroe, with the addition of Monroe Election Districts 2 and 19 (the area that is now Election Districts 9, 19 and 35), and Woodbury Election District 3.  The 2010 adjusted population of this area is 22,945, 29.78% greater than the target population of 17,680.

The proposed configuration of Legislative District 1 includes the majority of the Village of Kiryas Joel in addition to Woodbury Election District 3.  The portion of the Village northwest of the intersection of County Route 44 and Mountain Road (Monroe Election Districts 20 and 21), as well as the portion of the Village bounded by Taitch Court, Mountain Road, Forest Road, and the Village of Kiryas Joel/Town and Village of Woodbury boundary (Monroe Election District 31) and Monroe Election District 19 have been removed from Legislative District 1. These proposed changes bring the 2010 adjusted population of proposed Legislative District 1 down to 17,326.

Proposed Legislative District 1 is comprised of the following election districts: Monroe 22, 23, 24, 25, 26, 27, 28, 29, 30, 32, 33, 34 and 35 and Woodbury 3.  All election districts for Monroe reflect the 2013 designations.

16

*NY 243049980v6*

**Legislative District 2**

The 2005 Legislative District 2 encompassed the Towns of Greenville, Mount Hope and Wawayanda in their entirety, including the Village of Otisville within the Town of Mount Hope, with the addition of Deerpark Election District 7.  The 2010 adjusted population of this area is 18,270, 3.34% greater than the target population of 17,680.

The proposed configuration of Legislative District 2 includes the southernmost portion of the City of Middletown (Middletown Election Districts 4-5, 4-6, and 4-7), the Town of Greenville in its entirety, the Village of Otisville and the southernmost two-thirds of the Town of Mount Hope (Mount Hope Election Districts 1, 3, and 4), the west side of the Town of Wawayanda and the southwestern-most portion of the Town of Wallkill.  These proposed changes enable the population of the adjacent legislative districts to be within acceptable limits, as well as creating a more compact district that is closer to the target population than the existing district; the 2010 adjusted population of proposed Legislative District 2 is 17,418, 1.48% lower than the target population.

Proposed Legislative District 2 is comprised of the following election districts: Greenville 1, 2, 3, and 4; Middletown 4-5, 4-6, and 4-7; Mount Hope 1, 3, and 4; Wallkill 4-4; and Wawayanda 3, 5, and 6.

**Legislative District 3**

The 2005 Legislative District 3 encompassed the Town of Minisink in its entirely including the Village of Unionville, the Village of Florida within the Town of Warwick, and the west half of the Town of Warwick, including the hamlets of Amity and Pine Island.  The 2010 adjusted population of this district is 17,965, 1.61% greater than the target population of 17,680.

NY 243049980v6

The proposed configuration of Legislative District 3 also includes the Town of Minisink and the Village of Unionville, the Village of Florida within the Town of Warwick, and much of the west half of the Town of Warwick, including the hamlets of Pine Island and Amity.  This proposal adds Wawayanda Election District 1, which is the southernmost election district in the Town of Wawayanda, and removes Warwick Election Districts 12 and 27 from Legislative District 3 into Legislative District 10.  This creates a legislative district that is more compact than the existing district, and enables the adjacent Legislative District 10 to be within the acceptable range of population.  The 2010 adjusted population of proposed Legislative District 3 is 17,312, 2.08% lower than the target population.

Proposed Legislative District 3 is comprised of the following election districts: Minisink 1, 2, 3, and 4; Warwick 1, 2, 3, 4, 15, 17, 20, 23, 24, 28 and 30; and Wawayanda 1.

**Legislative District 4**

The 2005 Legislative District 4 was formed using the election districts of the nine-ward configuration of the City of Newburgh. The existing legislative district therefore consists of the east half of the city, stretching from the Quassaick Creek to the hamlet of Balmville and incorporating the area known as Washington Heights, the southeast quadrant of the city.  The 2010 adjusted population of existing Legislative District 4 is 15,135, 14.39% lower than the target population.

In 2011, the Newburgh City Council voted to reconfigure the election districts within the city to create four wards, and the Orange County Board of Elections subsequently redrew the election districts within the city to conform to the ward boundaries and reduced the number of election districts within the city from 23 to 15.  The existing election districts and ward boundaries do not conform in all areas to the previous election district boundaries, which

18

requires at least one change to be made to make the Legislative District conform to the component election districts; additionally, in order to conform to the "one person, one vote" constitutional standard, the legislative district must be redrawn to give all residents of Orange County as equal a voice as possible.  Information received during the redistricting process implied that the residents of the City of Newburgh were concerned about the balance of racial and ethnic groups as represented in the city's legislative districts (Legislative Districts 4 and 6); specifically, the residents wanted to ensure that African-Americans and Latinos were proportionally represented in each of the city's districts.

In order to create two districts that have a majority nonwhite population and a representation of African-Americans and Latinos in each district that is proportional to their representation in the city, each of the districts must contain election districts located outside the city, instead of one district entirely within the city and one containing election districts both inside and outside the city boundary.

The proposed configuration of Legislative District 4 also consists of the east half of the city bordering the Hudson River, stretching from the Quassaick Creek to the hamlet of Balmville and incorporating Washington Heights. The 2010 adjusted population of the proposed district is 16,955, 4.1% lower than the target population, provides a Latino population that is 43.1%, an African-American population of 34.5% and a combined minority population of 77.6%. Additionally, to the greatest extent possible, this configuration respects the boundaries of the new ward system.

Proposed Legislative District 4 is comprised of the following election districts: City of Newburgh 1-1, 1-2, 1-3, 1-4, 2-1, 2-2, and 4-1; Town of Newburgh 1 and 2.

NY 243049980v6

**Legislative District 5**

The 2005 Legislative District 5 included most of the Village of Goshen, the northeasternmost part of the Town of Goshen, and the western and northwestern areas of the Town of Blooming Grove including the Village of Washingtonville.   The 2010 adjusted population of existing Legislative District 5 is 17,219, 2.61% below the target population.

The proposed configuration of Legislative District 5 consists of the center of the Town of Blooming Grove, the Village of South Blooming Grove, the northeastern-most third of the Town and Village of Woodbury, and the remaining portions of the Town of Monroe within and immediately surrounding the Village of Kiryas Joel.   This allows the remaining portion of the Village of Kiryas Joel to be kept together in only one additional district and allows the surrounding districts to have relatively compact configurations and meet their population targets. The 2010 adjusted population of the proposed district is 18,364, 3.87% higher than the target population.

Proposed Legislative District 5 consists of the following districts: Blooming Grove 1, 4, 6, 7, 9, 15 and 16; Monroe 18, 20, 21 and 31; Woodbury 4, 5, 6, 7 and 10.

**Legislative District 6**

The 2005 Legislative District 6 was formed using the election districts of the nine-ward configuration of the City of Newburgh.  The existing legislative district therefore consists of the west half of the city, stretching from the Quassaick Creek to Cronomer Hill Park.  The 2010 adjusted population of existing Legislative District 6 is 16,692, 5.59% lower than the target population.

As stated previously, in 2011, the Newburgh City Council voted to reconfigure the election districts within the city to create four wards, and the Orange County Board of Elections

*NY 243049980v6*

subsequently redrew the election districts within the city to conform to the ward boundaries and reduced the number of election districts within the city from 23 to 15.  The existing election districts and ward boundaries do not conform in all areas to the previous election district boundaries, which requires at least one change to be made to make the Legislative District conform to the component election districts.   Additionally, similar to proposed Legislative District 4, in order to conform to the "one person, one vote" constitutional standard, Legislative District 6 must be redrawn to give all residents of Orange County as equal a voice as possible. Information received during the redistricting process implied that the residents of the City of Newburgh were concerned about the balance of racial and ethnic groups as represented in the city's legislative districts (Legislative Districts 4 and 6); specifically, the residents wanted to ensure that African-Americans and Latinos were proportionally represented in each of the city's districts.

In order to create two districts that have a majority nonwhite population and a representation of African-Americans and Latinos in each district that is proportional to their representation in the city, each of the districts must contain election districts located outside the City, instead of one district entirely within the City and one containing election districts both inside and outside the city boundary.

The proposed configuration of Legislative District 6 also consists of the west half of the city bordering the Hudson River, stretching from the Quassaick Creek to Cronomer Hill Park and incorporating suburbs immediately adjacent to the city boundary.  The 2010 adjusted population of the proposed district is 18,023, 1.94% higher than the target population, provides a Latino population that is 42.1%, an African-American population of 21.4% and a combined minority

21

population of 63.5%. Additionally, to the greatest extent possible, this configuration respects the boundaries of the new ward system.

Proposed Legislative District 6 is comprised of the following election districts: City of Newburgh 3-1, 3-2, 3-3, 3-4, 4-2, 4-3, 4-4 and 4-5; Town of Newburgh 3, 4, 5 and 6.

**Legislative District 7**

The 2005 Legislative District 7 contained the bulk of the Town of Monroe outside the Village of Kiryas Joel, with the exception of the westernmost election district that formed a bridge between the Towns of Chester and Monroe. The 2010 adjusted population of existing Legislative District 7 is 17,190, 2.77% below the target population of 17,680.

In 2012, the Town of Monroe underwent election district changes due to the number of registered voters per district. Four existing election districts were split to accommodate new voters, bringing the total number of election districts in the Town of Monroe to 35; the Town of Monroe election districts were then renumbered so that the numbers would be more consecutive and logical. The proposed configuration of Legislative District 7 contains the Village of Monroe in its entirety, allows the Village of Harriman to be unified across town lines, allows the Village of Kiryas Joel to be contained in the minimum number of districts, and keeps the remainder of the Town of Monroe in one legislative district. To the greatest extent possible, this configuration honors and unifies communities of interest. The 2010 adjusted population of the proposed Legislative District 7 is 17,309, 2.1% below the target population.

Proposed Legislative District 7 is comprised of the following election districts: Monroe 1, 2, 3, 4, 5, 6, 7, 10, 11, 12, 13, 14, 15, 16, 17 and 19.

**Legislative District 8**

The 2005 Legislative District 8 contained the Towns of Chester and Tuxedo in their entirety and included one election district in the Town of Monroe to bridge the geographic gap between the two towns and two election districts in the Town of Warwick to reach the necessary population.  The 2010 adjusted population of existing Legislative District 8 is 17,043, 3.6% below the target population.

The proposed configuration of Legislative District 8 contains the Town of Tuxedo in its entirety and the southwesterly portion of the Town of Warwick, including the Villages of Warwick and Greenwood Lake.  This configuration allows the villages to remain unified. The 2010 adjusted population of the proposed Legislative District 8 is 17,434, 1.39% below the target population.

Proposed Legislative District 8 is comprised of the following election districts: Tuxedo 1, 2, 3 and 4; Warwick 5, 7, 8, 10, 11, 13, 14, 16, 18, 19, 21, 22, 25 and 31.

**Legislative District 9**

The 2005 Legislative District 9 encompassed the Villages of Walden and Montgomery, the western half of the Town of Montgomery and the southeastern quadrant of the Town of Crawford, together with a portion of the Town of Montgomery to the northeast of the Village of Walden.  The 2010 adjusted population of existing Legislative District 9 is 18,234, 3.13% higher than the target population.

The proposed configuration of Legislative District 9 removes the Town of Crawford and the Village of Walden and adds the southeastern portion of the Town of Wallkill and the Village of Maybrook within the Town of Montgomery.  This configuration allows the surrounding districts to be as compact as possible while still maintaining the target population goals.  The

23

2010 adjusted population of proposed Legislative District 9 is 17,607, 0.41% below the target population.

Proposed Legislative District 9 is comprised of the following election districts: Montgomery 1, 2, 3, 11, 12, 13, 15, 16 and 18; Wallkill 1-4, 1-5, 1-6, 2-2, 2-3, 2-7 and 3-6.

**Legislative District 10**

The 2005 Legislative District 10 contained the Villages of Greenwood Lake and Warwick as well as the remainder of the east half of the Town of Warwick, with the exception of two election districts in the King's Estates area along the Town of Chester border.  The 2010 adjusted population of existing Legislative District 10 is 15,675, 9.7% below the target population.

The proposed configuration of Legislative District 10 contains the Town of Chester in its entirety and the northeast quadrant of the Town of Warwick, the area of the Town roughly bounded by the Village of Florida to the north, the Village of Warwick to the south and the Town of Chester to the northeast.  This configuration is compact, maintains the community of interest that is the hamlet of Sugar Loaf, and keeps the Town of Chester intact. The 2010 adjusted population of the proposed Legislative District 10 is 17,806, 0.71% higher than the target population.

Proposed Legislative District 10 is comprised of the following election districts: Chester 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 and 12; Warwick 6, 9, 12, 26, 27 and 29.

**Legislative District 11**

The 2005 Legislative District 11 encompassed the Town of Hamptonburgh in its entirety as well as the westernmost two-thirds of the Town of New Windsor, including Stewart Airport

24

and its environs.  The 2010 adjusted population of this area is 18,999, 7.46% higher than the target population of 17,680.

The proposed configuration of Legislative District 11 includes the entire Town of Hamptonburgh, the western half of the Town of New Windsor, and the northeastern quadrant of the Town of Blooming Grove that includes the Village of Washingtonville. This configuration allows the Village to be maintained within a single legislative district and will likely prove logical to the community, as it contains most of the Washingtonville School District.  The 2010 adjusted population of proposed Legislative District 11 is 17,975, 1.67% higher than the target population.

Proposed Legislative District 11 is comprised of the following election districts: Blooming Grove 3, 5, 10, 11, 12 and 14; Hamptonburgh 1, 2, 3, 4 and 5; New Windsor 5, 16, 20 and 21.

## Legislative District 12

The 2005 Legislative District 12 encompassed that portion of the United States Military Academy located in the Town of Woodbury, as well as the majority of the Town of Cornwall and the eastern portion of the Town of Blooming Grove.  The 2010 adjusted population of this area is 16,486, 6.75% lower than the target population.

The proposed configuration of Legislative District 12 includes the entire Town of Cornwall, a portion of the Town of New Windsor, and the southeastern quadrant of the Town of Blooming Grove.  This configuration allows the United States Military Academy to be maintained within a single legislative district, as well as maintaining the Town of Cornwall within a single district.  The 2010 adjusted population of proposed Legislative District 12 is 17,793, 0.64% higher than the target population.

25

Proposed Legislative District 12 is comprised of the following election districts: Cornwall 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 14; Blooming Grove 8 and 13; New Windsor 19.

## Legislative District 13

The 2005 Legislative District 13 encompassed the city of Port Jervis in its entirety and the majority of the Town of Deerpark.  The 2010 adjusted population of this area is 15,675, 11.34% lower than the target population.

The proposed configuration of Legislative District 13 includes the entire Town of Deerpark, the entire City of Port Jervis, and the northernmost third of the Town of Mount Hope. This configuration allows population targets to be met in the most compact way.  The 2010 adjusted population of proposed Legislative District 13 is 18,055, 2.12% higher than the target population.

Proposed Legislative District 13 is comprised of the following election districts: Deerpark 1, 2, 3, 4, 5, 6 and 7; Mount Hope 2; Port Jervis 1-1, 1-2, 2-1, 2-2, 3-1, 3-2, 4-1 and 4-2.

## Legislative District 14

The 2005 Legislative District 14 encompassed that portion of the United States Military Academy located in the Town of Highlands, as well as the remainder of the Town of Highlands including the Village of Highland Falls and the hamlet of Fort Montgomery and the majority of the Town and Village of Woodbury, excepting the portion of the USMA in the Town of Woodbury and Woodbury Election District 3.  The 2010 adjusted population of this area is 21,629, 22.34% higher than the target population.

NY 243049980v6

The proposed configuration of Legislative District 14 includes the entire Town of Highlands, the eastern half of the Town of Woodbury including the remainder of the United States Military Academy, and the Village of Harriman in its entirety. This configuration allows the United States Military Academy to be maintained within a single legislative district, as well as maintaining the Village of Harriman within a single district. The 2010 adjusted population of proposed Legislative District 14 is 17,984, 1.72% higher than the target population.

Proposed Legislative District 14 is comprised of the following election districts: Highlands 1, 2, 3, 4, 5 and 6; Monroe 8 and 9; Woodbury 1, 2, 8 and 9.

**Legislative District 15**

The 2005 Legislative District 15 encompassed the easternmost one-third of the Town of New Windsor as well as three districts in the Town of Cornwall immediately west of the Village of Cornwall-on-Hudson. The 2010 adjusted population of this area is 16,015, 9.42% lower than the target population.

The proposed configuration of Legislative District 15 includes the eastern half of the Town of New Windsor. This configuration allows Legislative District 15 to be maintained within a single municipality, as well as maintaining the Town of Cornwall within a single adjacent district. The 2010 adjusted population of proposed Legislative District 15 is 17,780, 0.57% higher than the target population.

Proposed Legislative District 15 is comprised of the following election districts: New Windsor 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17 and 18.

**Legislative District 16**

The 2005 Legislative District 16 included the northern half of the Town of Newburgh, in addition to several election districts along the western edge of the City of Newburgh/Town of

27

Newburgh boundary.  The 2010 adjusted population of this area is 17,319, 2.04% lower than the target population.

The proposed configuration of Legislative District 16 includes the northeastern quadrant of the Town of Newburgh, from the County boundary south to the Orange Lake area in the eastern half of the district and south to Interstate 84 in the western half of the district.  This configuration allows a more compact district design both for Legislative District 16 and Legislative District 17, its immediate neighbor to the west.  The 2010 adjusted population of proposed Legislative District 16 is 17,482, 1.12% lower than the target population.

Proposed Legislative District 16 is comprised of the following election districts: Town of Newburgh 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 20, 23, 24 and 25.

**Legislative District 17**

The 2005 Legislative District 17 contained the southwestern quadrant of the Town of Newburgh as well as most of the eastern half of the Town of Montgomery, including the Village of Maybrook within the Town of Montgomery.  The 2010 adjusted population of this area is 16,537, 6.46% lower than the target population.

The proposed configuration of Legislative District 17 includes the westernmost one-third of the Town of Newburgh and most of the eastern half of the Town of Montgomery, including the Village of Walden but excluding the Village of Maybrook.  This configuration allows a compact district design for both Legislative District 16 and Legislative District 17.  The 2010 adjusted population of proposed Legislative District 17 is 17,787, 0.61% higher than the target population.

Proposed Legislative District 17 is comprised of the following election districts: Montgomery 4, 5, 6, 7, 8, 9, 10, 14 and 17; Town of Newburgh 7, 8, 19, 21, 22 and 26.

NY 243049980v6

**Legislative District 18**

The 2005 Legislative District 18 contained all the Town of Crawford except the southeastern quadrant, together with the majority of the Town of Wallkill surrounding the City of Middletown.  The 2010 adjusted population of this area is 18,434, 4.26% higher than the target population.

The proposed configuration of Legislative District 18 includes the entire Town of Crawford and the northwestern quadrant of the Town of Wallkill.  This configuration allows a more compact district design as well as unifying the Town of Crawford into one legislative district.  The 2010 adjusted population of proposed Legislative District 18 is 17,575, 0.59% lower than the target population.

Proposed Legislative District 18 is comprised of the following election districts: Crawford 1, 2, 3, 4, 5, 6, 7 and 8; Wallkill 1-1, 1-2, 1-3, 1-7, 4-1, 4-2, 4-3 and 4-5.

**Legislative District 19**

The 2005 Legislative District 19 contained a portion of the City of Middletown and the election districts in the Town of Wallkill that lie to the north and northeast of the City of Middletown, including the hamlet of Scotchtown.  The 2010 adjusted population of this area is 17,361, 1.8% lower than the target population.

The proposed configuration of Legislative District 19 includes all of Ward 1 of the City of Middletown and the election districts on the eastern boundary of the city in the Town of Wallkill, stretching northeast to the hamlet of Scotchtown.  This configuration allows for a compact district while respecting the ward system in the City of Middletown.  Additionally, the combined minority population of the proposed district is 54.1%; no district can be created in the City of Middletown with a majority Latino or majority African-American population, but the two

NY 243049980v6

legislative districts (19 and 20) that cover the bulk of the city can both support a majority population that is a combination of those two demographic groups. The 2010 adjusted population of proposed Legislative District 19 is 18,009, 1.86% higher than the target population.

Proposed Legislative District 19 is comprised of the following election districts: Middletown 1-1, 1-2, 1-3, 1-4, 1-5 and 1-6; Wallkill 2-1, 2-4, 2-5, 2-6, 3-1, 3-2, 3-3, 3-4, 3-5 and 3-7.

**Legislative District 20**

The 2005 Legislative District 20 contained the majority of the City of Middletown. The 2010 adjusted population of this area is 17,361, 1.8% lower than the target population.

The proposed configuration of Legislative District 20 includes wards 2 and 3 of the City of Middletown in their entirety, and the northern half of Ward 4. This configuration allows for a compact district while respecting the ward system in the City of Middletown to the greatest possible extent. Additionally, the combined minority population of the proposed district is 66.4%; no district can be created in the City of Middletown with a majority Latino or majority African-American population, but the two legislative districts (19 and 20) that cover the bulk of the city can both support a majority population that is a combination of those two demographic groups. The 2010 adjusted population of proposed Legislative District 20 is 18,137, 2.58% higher than the target population.

Proposed Legislative District 20 is comprised of the following election districts: Middletown 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 3-1, 3-2, 3-3, 3-4, 3-5, 4-1, 4-2, 4-3 and 4-4.

**Legislative District 21**

The 2005 Legislative District 21 encompassed the majority of the Town of Goshen, including one election district within the Village of Goshen and all that portion of the Town to

30

the south, east and west of the village boundary, as well as the southernmost portion of Ward 4 in the City of Middletown and two election districts in the Town of Wallkill on the southern town boundary east of the city of Middletown. The 2010 adjusted population of this area is 19,000, 7.47% higher than the target population.

The proposed configuration of Legislative District 21 includes the Town of Goshen in its entirety, together with the easternmost election district in the Town of Blooming Grove and the northwestern-most election districts in the Town of Wawayanda. This configuration allows for a more compact district. The 2010 adjusted population of proposed Legislative District 21 is 17,179, 2.83% lower than the target population of 17,680.

Proposed Legislative District 21 is comprised of the following election districts: Blooming Grove 2; Goshen 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 and 13; Wawayanda 2 and 4.

NY 243049980v6

## VI.   CONCLUSION

For the reasons detailed above, and in the accompanying exhibits, it is the recommendation of the Special Master that the Court adopt the recommended plan as the Legislative redistricting plan for the County of Orange for use in the November, 2013 legislative election.   The Special Master's report satisfies the applicable principles of the United States Constitution of one person/one vote and the Voting Rights Act of 1965 and was prepared in accordance with 2010 census data.

I want to acknowledge the invaluable assistance of Henry M. Greenberg of my law firm, and the Commissioner and planners of the County of Orange Planning Department.  It has indeed been a tremendous honor to have served as Special Master in this matter and to have worked with such knowledgeable and talented people.  My thanks also to Counsel for reaching agreement on key issues.

Respectfully submitted,

Carmen Beauchamp Ciparick
Special Master

Dated: June 3, 2013

Copies provided to:
Henry M. Greenberg, Esq.
Michael H. Sussman, Esq.
Benjamin Ostrer, Esq.
Commissioner David Church

32